UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-12124-RGS

UNITED STATES OF AMERICA and COMMONWEALTH OF
MASSACHUSETTS ex rel. DONNA MARIE GLYNN

v.

COMPASS MEDICAL, P.C., PARTNERS COMMUNITY
HEALTHCARE, INC., and JOHN DIORIO

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS TO DISMISS

November 10, 2011

STEARNS, D.J.

On December 16, 2009, plaintiff/relator Donna Marie Glynn, a nurse practitioner

formerly employed by Compass Medical, P.C. (Compass), brought this action under

the federal False Claims Act (FCA), 31 U.S.C. § 3729 (a)(1)-(2).[1]  Glynn alleges that

---

[1]  The Fraud Enforcement and Recovery Act (FERA), which amended and renumbered 31 U.S.C. § 3729(a), was signed into law on May 20, 2009.  Glynn filed her First Amended Complaint on May 20, 2011, specifying conduct that largely predated May of 2009. In her Complaint, she cites the language of the predecessor statute. As these motions do not require the court to determine whether the pre- or post-FERA version of the FCA applies, in the interest of consistency, the court will also cite to the pre-FERA version of the two subsections at issue. The predecessor language and numbering is set out below:

Compass Medical, P.C. (Compass), Partners Community Healthcare, Inc. (Partners), and John Diorio violated the FCA (Count I), subjected her to a retaliatory termination in violation of 31 U.S.C. § 3730(h) (Count II), violated the Massachusetts False Claims Act (MFCA), Mass. Gen. Laws ch. 12, § 5A (Count III), and the MFCA retaliatory termination provision, Mass. Gen. Laws ch. 12, § 5J (2) (Count IV), wrongfully terminated her in violation of Massachusetts public policy (Count V), and failed to pay overtime hours as required by Mass. Gen. Laws ch. 151, § 1A (Count VI).[2]

Glynn alleges that Diorio, a physician with whom she worked at Compass, fraudulently filled out patient billing sheets in order to bill Medicare and Medicaid for

---

(a) Liability for certain acts. Any person who
(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

The new language/numbering is as follows:

(a) Liability for certain acts
(1) In general. Subject to paragraph (2), any person who
(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . .

[2] Glynn filed a complaint for overtime pay violations with the Massachusetts Attorney General and received a right to sue letter with respect to this claim. First Am. Compl. ¶ 27.

fictional visits to nursing home patients, care that was not medically necessary or appropriate, and improper patient discharges and pronouncements of death. Glynn contends that Diorio's false billing sheets were used by Compass and Partners to prepare claims that were submitted to the federal government and the Commonwealth of Massachusetts for payment. Glynn alleges that after she made her suspicions about Diorio known to Compass and Partners employees, she was fired from her job.

## PROCEDURAL BACKGROUND

After the United States declined to intervene, the case was unsealed on January 11, 2011. The defendants filed motions to dismiss Glynn's Complaint in early May of 2011, prompting her to amend the Complaint on May 20, 2011. Compass and Partners then moved to dismiss Glynn's First Amended Complaint in June of 2011, pursuant to Fed. R. Civ. P. 12(b)(6). Defendants also submitted a motion to stay discovery, which this court granted in part and denied in part on September 8, 2011, restricting discovery to certain events that took place in May of 2009. On August 8, 2011, Glynn filed an affidavit providing additional assertions of factual detail that are not contained in the Amended Complaint.[3] A hearing on defendants' motions to dismiss was held on

---

[3] Glynn's affidavit, which is not part of or attached to her Complaint, will not be considered in deciding defendants' motions to dismiss. *See Young v. Lepone*, 305 F.3d 1, 10-11 (1st Cir. 2002) ("[The] fate of a motion to dismiss under Rule 12(b)(6) ordinarily depends on the allegations contained within the four corners of the plaintiff's

October 7, 2011.

## FACTUAL BACKGROUND

Compass is a Massachusetts corporation that provides health care services to Medicare and Medicaid patients in Massachusetts, including approximately 200 nursing home patients in the Brockton, Massachusetts area. First Am. Compl. ¶ 2. Partners is a private health insurance provider, and is affiliated with Compass. Diorio is a physician employed by Compass. According to Glynn, the health care providers with whom she worked were employees of Compass, while the administrative personnel, including the office managers and billing clerk, were employees of Partners. *Id.* ¶¶ 22, 104.[4]

---

Complaint."); *cf. Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), overruled on other grounds by *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1121 (9th Cir. 2002) ( "[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss."). For explanatory purposes only, some facts contained in Glynn's affidavit are referenced in footnotes to this decision.

[4] According to Glynn's affidavit, Compass and Partners are required to abide by Medicare and Medicaid rules and regulations (a matter for judicial notice). A physician treating a Medicare or Medicaid patient is required to enter a detailed description of the care given in the patient's chart, accompanied by a particular diagnosis and billing codes on a standard billing sheet. Glynn Aff. ¶¶ 6, 8-9, 14. The complexity of the care provided determines the physician's choice of billing codes. *Id.* ¶14. At Compass, the standard operating procedure was for providers to submit their handwritten billing sheets to the billing clerk, Maureen Nye, a Partners' employee. *Id.* ¶ 9. Nye's job was to enter the information daily into the computer system, thereby creating and submitting

Glynn has worked as a healthcare professional since 1979, and was employed by Compass for approximately fourteen (14) years prior to her termination in June of 2009. *Id.* ¶ 32. Over her career, Glynn has taught college-level Medicare and Medicaid compliance courses. *Id.* ¶¶ 52-53. Shortly after beginning to work with Diorio at Compass, Glynn came to suspect that he was involved in Medicare and Medicaid billing fraud.[5] *Id.* ¶¶ 47, 33. Glynn believes that Diorio engaged in billing misconduct at Colony House Nursing Home in Abington, Southeast Rehabilitation in Easton, and St. Joseph's Manor in Brockton. *Id.* ¶ 93. Glynn alleges that Diorio frequently submitted billing sheets that recorded patient care that was not medically necessary or that had never been provided.[6]

On one occasion, Dr. Sonali Khond, another Compass physician, told Glynn that

---

an electronic claim for payment. *Id.* ¶ 9. Each month the office manager, Kelly Johnson, distributed monthly billable revenue sheets to all health care providers that summarized the government payments rece for the care given to each Medicare and Medicaid patient. *Id.* ¶ 16.

[5] Glynn alleges that she initially gave Diorio the benefit of the doubt and worked with Compass and Partners personnel to develop new forms that would be easier for Diorio to complete accurately. *Id.* ¶ 102.

[6] Diorio and Glynn became antagonists after Diorio was sued for malpractice and Glynn refused his request to testify falsely at a deposition. Am. Compl. ¶¶ 34, 41, 42, 43-44. Glynn alleges that after she rebuffed Diorio and testified truthfully, he became "extremely hostile" and told her on multiple occasions that because she had "failed to support him" during the malpractice action, he "could not trust her." *Id.* ¶¶ 45-46.

Diorio had visited one of her nursing home patients and had merely signed off on notes that she had made the day before, while subsequently billing for the visit. *Id.* ¶¶ 55-58. A nurse at Colony House also told Glynn that Diorio would frequently sign a patient's file without having seen the patient. *Id.* ¶¶ 94-97.

On another occasion in May of 2009, Glynn alleges that Diorio billed Medicare for seeing approximately sixty Medicare patients at several nursing homes over the weekend, even though he had worked only five hours on each of the two days.[7] *Id.* ¶¶ 73, 74. Glynn, Johnson, Nye, and Kathleen Pacheco, another Compass nurse practitioner, undertook a covert investigation of Diorio's weekend billing sheets. They determined that for Diorio to have seen the number of patients for whom he had billed, he would have had to have worked a minimum of nine hours each day. The group concluded that Diorio's billings were, at least in part, fake. *Id.* ¶¶ 75-76. Glynn's suspicions were confirmed when the daughter of one of the sixty patients, June Chin, told Glynn that no doctor had seen or treated her mother, Louise Marotti, over the weekend in question. *Id.* ¶¶ 77-79.

At some point, Nye told Glynn that Diorio had ordered her to submit bills for

_____

[7] Although Glynn states several times that "Diorio billed Medicare," the allegations of her Complaint and Affidavit are that Diorio filled out false billing sheets, and then gave them to the billing clerk who submitted them to the federal government and/or the Commonwealth of Massachusetts.

nursing home patients whom he had not treated, instructing her to "use the same codes as last time." *Id.* ¶¶ 82, 83. Nye admitted to Glynn that she followed Diorio's instructions, even though she knew the billings contained false statements. *Id.* ¶ 85. According to Glynn, "on many occasions" she told Diorio that his practices were wrong and potentially dangerous to patients' health. *Id.* ¶ 89. On one of these occasions, Diorio responded to Glynn's accusations by explaining that he sometimes "gets caught up in the revenues" and that he needed extra money for an upcoming trip to Italy. *Id.* ¶ 92.

Glynn alleges that employees at both Compass and Partners were aware of Diorio's fraudulent conduct because she had discussed her concerns with Johnson; Nye; Michelle Niverson, the Compass compliance clerk (who is also an employee of Partners); John Sarro, the former Chief Operating Officer of Compass (and an employee of Partners); Jamie Barber, who replaced Sarro in that position; and Barbara Simonson, an outside consultant who conducted annual compliance reviews at Compass. *Id.* ¶¶ 60-65. Glynn states that Johnson and Nye showed her Diorio's billing sheets on "numerous occasions" and told Glynn that they shared her concerns. *Id.* ¶ 98. Glynn alleges that despite this knowledge, they continued to submit Diorio's false claims to the government for payment. *Id.* ¶¶ 108-109.

At some point in mid-to-late May of 2009, Glynn told Diorio that she intended

to make another report of his unlawful behavior to the compliance office. *Id.* ¶ 110. Approximately two weeks later, Glynn was terminated – an "irreparable breakdown" in her relationships with her co-workers at Compass was given as the reason. *Id.* ¶¶ 110-111. Glynn alleges that this explanation of her termination was a "pretext" because her managers had never questioned the quality of her work. *Id.* ¶¶ 112-114.[8]

## DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation omitted). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950. In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "[w]hile a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal citations and quotations

---

[8] Glynn also maintains that she often worked more than a forty-hour work week, but was never paid overtime at the legally required rate, and was instead ordered to "bank" her excess hours and to take "comp time." *Id.* ¶¶ 115-117.

omitted).

### The FCA (a)(1)-(a)(2) Claims

Subsection (a)(1) of "[t]he [federal] FCA imposes liability upon persons who (1) present or cause to be presented to the United States government, a claim for approval or payment, where (2) that claim is false or fraudulent, and (3) the action was undertaken 'knowingly,' in other words, with actual knowledge of the falsity of the information contained in the claim, or in deliberate ignorance or reckless disregard of the truth or falsity of that information." *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 225 (1st Cir. 2004), abrogated by *United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 42 (1st Cir. 2009), citing 31 U.S.C. § 3729(a)(1) & (b). Subsection (a)(1) penalizes a person for knowingly *presenting* or causing to be *presented* a false claim to the government for payment or approval. Subsection (a)(2), on the other hand, penalizes a person who knowingly "makes, uses, or causes to be made or used, a *false record or statement* to *get* a false or fraudulent claim paid or approved by the Government."[9] *See* 31 U.S.C. § 3729(a)(1) (emphasis added).

---

[9] The 2009 amendment changed the wording of (a)(2) to "knowingly makes, uses, or causes to be made or used, a false record or statement *material* to a false or fraudulent claim." 31 U.S.C. § 3729(a)(2) (emphasis added).

"For purposes of both subsections, '[a] person acts 'knowingly' if he or she '(1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.'" *United States ex. rel. Dyer v. Raytheon Co.,* 2011 WL 3294489, at *6 (D. Mass. Jul. 29, 2011), quoting *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 380 (1st Cir. 2011); *see also Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 672-673 (2008) (the elements of an FCA claim require proof that a defendant knew, as a "natural, ordinary and reasonable consequence[]" of its acts, that false claims would be submitted to the government for payment).

It is well established that the heightened pleading requirements of Fed. R. Civ. P. 9(b) apply to claims brought under both subsections. *See Gagne*, 565 F.3d at 45. Although Rule 9(b) may be satisfied where "some questions remain unanswered [but] the complaint as a whole is sufficiently particular to pass muster under the FCA," *id.* at 46, quoting *United States ex rel. Rost v. Pfizer, Inc.,* 507 F.3d 720, 732 (1st Cir. 2007), "*Karvelas* requires the complaint to provide, among other fraud specifics, 'details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, [and] the amount of money charged to the government.'" *Gagne*, 565 F.3d at 46, quoting *Karvelas*, 360 F.3d at 233. Defendants argue that

10

Glynn has failed to plead her FCA claims with any of the requisite particularity. The court agrees.

For Glynn to make out her subsection (a)(1) claim, she must show that a false claim was actually presented to the government. *See Gagne*, 565 F.3d at 45-46, citing *Allison Engine*, 553 U.S. at 669-671. Glynn has not alleged any particulars regarding the "presentment" of any specific claim to the government. She alleges only that Compass and Partners employees submitted claims based on Diorio's billing statements to the government despite knowing or having reason to know that in some respects they were fraudulent. Glynn does not allege specific billing codes, dates, claim numbers, or patients associated with such false claims, or even the name of the government agency to which the claims were allegedly submitted. Because Glynn has failed to allege with particularity the actual presentment of any individual claim, her subsection (a)(1) cause of action fails.

With respect to Glynn's subsection (a)(2) claim, her footing is no more firm. Glynn contends that Diorio fabricated billing sheets by inserting inflated billing codes or by listing patient visits that had never occurred and that he gave these sheets to Nye with instructions to submit them for payment. In *Gagne*, a case somewhat similar in its facts, the Court of Appeals explained that the relator had failed to successfully plead a subsection (a)(2) claim where, as here, it was simply alleged that defendants had

falsified and submitted fraudulent time sheets that were eventually used to create invoices submitted for payment. *Gagne,* 565 F.3d at 47-48. "[A] conclusory allegation that defendants' submissions of time sheets was the making or usage of a false record or statement to get a false or fraudulent claim paid or approved by the government, absent more detail about those submissions and their connection to the false or fraudulent claims, is insufficient under Rule 9(b)." *Id.* at 48, citing *Rost*, 507 F.3d at 731. Glynn's Complaint lacks these same details. She fails to allege when the false statements were actually recorded on specific billing sheets that Diorio gave to Nye to "get a false or fraudulent claim paid." *See* 31 U.S.C. § 3729(a)(1). Nor does she connect any given billing sheet to a specific patient, nursing home, date, billing code, or the treatment claimed.

In response, Glynn argues that she has made out at least one instance of Diorio's recording a false statement in order to get a claim paid. On a given weekend in May of 2009, Diorio claimed to have seen sixty nursing home patients, among whom he listed Marotti, when according to a statement Glynn attributes to Marotti's daughter, no doctor had treated her mother. This double-hearsay allegation (mother to daughter to Glynn) does not comprise the personal knowledge of fraud that the FCA is intended to extract. *See United States ex rel. Joshi v. St. Luke's Hosp., Inc*., 441 F.3d 552, 561 (8th Cir. 2006), quoting *United States ex rel. Kinney v. Stoltz,* 327 F.3d 671, 674 (8th

Cir. 2003) ("The [FCA] is intended to encourage individuals who are either close observers or involved in the fraudulent activity to come forward, and is not intended to create windfalls for people with secondhand knowledge of the wrongdoing."). While in this one instance, it might be possible to match a billing code on behalf of a named patient with Glynn's allegations, she has no actual knowledge that Diorio did not in fact see Marotti on this occasion.[10]

Whatever Glynn may have to say about Diorio's tendency to play fast and loose with workplace rules, she has failed to expose a fraud on the government. *See Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011) ("[U]nsavory conduct is not, without more, actionable under the FCA."). More precisely, Glynn has not shown how Diorio's conduct falls within the ambit of subsection (a)(2) of the FCA. While the purpose of subsection (a)(2) is to bring under

---

[10] Despite Glynn's insistence that in at least this one instance evidence of a fraudulent claim is sufficiently presented, essential facts are lacking, such as when the government was billed, what agency was billed (state or federal), for how much, for what services, and whether the claim was ultimately paid. Nor is the court necessarily persuaded that a single incident of potential fraud can support allegations of a systemic scheme to defraud the United States, the rooting out of which is the statute's principal concern. *Cf. Hutcheson*, 647 F.3d at 378 (plaintiff adequately pled a subsection (a)(2) claim where defendant had "engaged in a nationwide kickback scheme to induce physicians to use its medical devices in spinal surgeries and [defendant] knew this scheme would cause physicians and hospitals (unwittingly) to present federal healthcare programs with payment claims that contained material misrepresentations.").

the FCA individuals who induce others to submit false claims to the government, it is construed more narrowly than subsection (a)(1). *See United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 498, 501 (D.C. Cir. 2004) ("[Subsection] (a)(2) is complementary to (a)(1), [and is] designed to prevent those who make false records or statements to get claims paid or approved from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval."). The FCA, when properly deployed, is a piece of heavy artillery in the war against government fraud. It is not, however, intended to serve as a general purpose anti-fraud statute or as a vehicle for employee grievances. *See Hopper v. Solvay Pharm., Inc.,* 588 F.3d 1318, 1328 (11th Cir. 2009).[11]

In her final effort to fend off the dismissal of her FCA claim, Glynn contends that she "knew first-hand" that FCA violations had occurred, but as a nurse practitioner she

---

[11] This case is easily distinguishable from *New York v. Amgen,* 652 F.3d 103 (1st Cir. 2011), and *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377 (1st Cir. 2011). In those cases, the First Circuit held that plaintiffs' subsection (a)(2) claims survived a motion to dismiss where defendants knowingly caused false claims to be submitted for payment and where the "falsity" of the claim was demonstrated by a showing that the submitted claims misrepresented compliance with a material precondition of payment. At issue here, by contrast, is plaintiff's failure to meet the specificity requirements of Rule 9(b). The First Circuit declined to address defendants' Rule 9(b) arguments in both *New York* and *Hutcheson* because they had not been raised below. *See New York,* 652 F.3d at 110 & n.7; *Hutcheson*, 647 F.3d at 384 n.8.

did not have access to the actual claims submitted to the government. She requests that the court permit her to take discovery in order to ferret out the records of these claims so that she can provide the identifying details. The First Circuit has explicitly rejected this "allege it now, prove it later" approach in FCA actions. *Karvelas*, 360 F.3d at 232-234 & n.17. Although Glynn's job as a nurse practitioner did not give her access to Compass's or Partners' billing records, "'neither the Federal Rules nor the [FCA] offer any special leniency under these particular circumstances to justify [Glynn] failing to allege with the required specificity the circumstances of the fraudulent conduct [she] asserts in [her] action.'" *Joshi*, 441 F.3d at 560, quoting *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1314 (11th Cir. 2002). Nor is the conduct about which Glynn complains (the unethical behavior of a single doctor in a large corporate medical organization) an instance of a "far-reaching" and complicated scheme in which "pleading every instance of fraud would be ungainly, if not impossible." *United States ex rel. Westmoreland v. Amgen, Inc.*, 738 F. Supp. 2d 267, 276 (D. Mass. 2010), citing *United States ex rel. Franklin v. Parke-Davis,* 147 F. Supp. 2d 39, 49 (D. Mass. 2001).

### Federal Retaliation Claim

To prevail on a claim for retaliation under the FCA, Glynn must show that: (1) she engaged in conduct protected under the FCA; (2) Compass knew that she was

15

engaged in such conduct; and (3) Compass discharged her because of her involvement in the protected conduct.[12] *See Karvelas*, 360 F.3d at 235; *Cafasso*, 637 F.3d at 1060. A retaliation claim may survive even if the whistleblower claim on which it is based does not. *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 416 (2005) ("A retaliation plaintiff, instead, need prove only that the defendant retaliated against him for engaging in 'lawful acts done . . . in furtherance of' an FCA 'action filed or to be filed,' [*see*] § 3730(h), language that protects an employee's conduct even if the target of an investigation or action to be filed was innocent."). Moreover, the heightened pleading requirements of Rule 9(b) do not apply to a retaliation claim based on an FCA violation. *See Karvelas*, 360 F.3d at 238 n.23.

Protected conduct in an FCA-retaliation context is interpreted broadly. *See United States ex rel. Gobble v. Forest Labs., Inc.*, 729 F. Supp. 2d 446, 449 (D. Mass. 2010), citing *Karvelas,* 360 F.3d at 237. Protected conduct includes "activities that reasonably could lead to an FCA suit, in other words, investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." *Karvelas*, 360 F.3d at 237. "A plaintiff, however, need not have known that his actions could lead to a qui tam suit

---

[12] Glynn alleges that she was employed by Compass, and not by Partners.

under the FCA, or even that a False Claims Act existed, in order to demonstrate that he engaged in protected conduct." *Gobble*, 729 F. Supp. 2d at 449, citing *Karvelas*, 360 F.3d at 237. The employee must, however, be actually engaged in investigating matters that at least reasonably could lead to an FCA action. *See United States ex. rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996).

Compass contends that Glynn has not alleged facts sufficient to show that she engaged in protected conduct because her investigative focus was on Diorio's alleged misbehavior, and not on losses of money by the government. Glynn, for her part, while acknowledging her efforts to enlist fellow employees in the quest for evidence of Diorio's questionable billings, notes that she related her suspicions about Diorio to Nye, the billing clerk, who told her that she had submitted the billings for payment at Diorio's direction. Glynn also notes that when she confronted Diorio about his billing practices, he confessed to her that "he sometimes got caught up in the revenues." While this is pretty thin gruel, it arguably has enough grit to support the inference that Glynn's inquiry was, at least potentially, motivated by a desire to protect the public fisc. *See Gobble*, 729 F. Supp. 2d at 450 (protected conduct element met where relator made inquiries about conduct actionable under the FCA, in addition to inquiries about nonactionable regulatory violations).

Glynn, however, must also surmount a second hurdle – she must show that

Compass knew that she was engaged in conduct that was protected under the FCA. "The defendants' requisite awareness 'mirrors the kind of protected activity in which an employee must be engaged.'" *Id.* quoting *Karvelas*, 360 F.3d at 238. On this score, Glynn's Complaint alleges only that she spoke to Nye, Johnson, and several other Compass and Partners' employees about Diorio's sketchy billing practices. The Complaint does not allege that Glynn informed any senior Compass official, such as Sarro or Barber, of her suspicions that false claims were being submitted on Diorio's behalf to a government agency. The Complaint alleges only that Diorio's "inaccurate and illegible" billing was a subject of speculative discussion and private detective work by Glynn and some of her colleagues. Nor does Glynn bridge the gap by asserting that she was fired on a "pretext."[13] She must instead plead a plausible causal connection between Compass's decision to terminate her employment and its knowledge or perception that she was engaged in protected FCA-related activity. This her Complaint

---

[13] Pretext is a concept derived from the burden-shifting paradigm applied in Title VII disparate treatment cases. It has only marginal relevance here where the truthfulness of Compass's explanation of why Glynn was terminated is not a determinative issue. Because Glynn's employment was at-will, Compass had the right to fire her for any reason that did not offend the FCA (or public policy) and had no obligation to give Glynn or anyone else an explanation for its decision.

fails to do.[14]

### State False Claims Act

The MFCA, Mass. Gen. Laws. ch. 12, § 5, is modeled after the federal FCA; thus, courts use the federal FCA for guidance in interpreting the MFCA.[15] *See Massachusetts v. Schering-Plough Corp.*, 779 F. Supp. 2d 224, 234 (D. Mass. 2011). With respect to her MFCA claim, Glynn alleges that defendants violated Mass. Gen. Laws. ch. 12, § 5B(1)-(2), the provisions of which are virtually identical to FCA subsections (a)(1) and (a)(2). Thus, for the reasons her FCA claim fails, it would appear that Glynn's MFCA claim may falter as well.[16]

---

[14] For similar reasons, Glynn does meet not the third element of an FCA claim – proof that her termination resulted from engaging in protected conduct.

[15] Partners asserts in a supplemental brief filed after the hearing (in response to a question raised by the court) that subject matter jurisdiction over Glynn's MFCA claim is lacking because Glynn has not met the statutory standing requirements of Mass. Gen. Laws. ch. 12, § 5C (which requires the relator to serve a copy of her Complaint on the Massachusetts Attorney General and then defer to the Attorney General's decision as to whether she will pursue the matter or decline to intervene). It is true that the court has not received notice of the Attorney General's decision. Whether the statute requires that a federal court be notified of the Attorney General's intervention decision need not now be decided.

[16] Although the court has (and will) comment briefly on this and other of Glynn's state claims, they need not be resolved. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine - judicial economy, convenience, fairness, and comity - will point toward declining to exercise jurisdiction over the remaining state-law claims.").

### State Retaliation Claim

Mass. Gen. Laws. ch. 12, § 5J(2), prohibits retaliatory termination for, among other things, "furthering a false claims action." However, Mass. Gen. Laws. ch. 12, § 5J(4) limits recovery under this section to certain plaintiffs. It states that:

> "An employee who is discharged, demoted, suspended, harassed, denied promotion, or in any other manner discriminated against in the terms and conditions of employment by his employer because of participation in conduct which directly or indirectly resulted in a false claim being submitted to the commonwealth or a political subdivision thereof shall be entitled to the remedies pursuant to paragraph (3) *only if both of the following occurred*:
>
> (i) the employee has been harassed, threatened with termination or demotion, or otherwise coerced by the employer or its management into engaging in the fraudulent activity in the first place; and
>
> (ii) the employee voluntarily disclosed information prior to being dismissed to a government or law enforcement agency or acts in furtherance of a false claims action, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed.

Mass. Gen. Laws. ch. 12, § 5J(4) (emphasis added). Because Glynn does not appear to allege facts sufficient to satisfy either subparagraphs (i) or (ii) of § 5J(4), Glynn's claim with respect to this state statute may fail as well.

### Wrongful Termination

"The general rule is that an employment-at-will contract can be terminated at any time for any reason or for no reason at all." *Folmsbee v. Tech Tool Grinding & Supply, Inc.*, 417 Mass. 388, 394 (1994), citing *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659,

668 n.6 (1981). However, "[a]s an exception to the general rule that an employer may terminate an at-will employee at any time with or without cause, [the SJC has] recognized that an at-will employee has a cause of action for wrongful termination only if the termination violates a clearly established public policy." *King v. Driscoll*, 418 Mass. 576, 582 (1994), citing *Flesner v. Technical Commc'n Corp.*, 410 Mass. 805, 810-811 (1991). Circumstances in which termination violates an established public policy generally include discharge for "'asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do what the law forbids (e.g., committing perjury).'" *Folmsbee*, 417 Mass. at 394, quoting *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. 145, 149-150 (1989). "[The SJC] consistently has interpreted the public policy exception narrowly, reasoning that to do otherwise would 'convert the general rule . . . into a rule that requires just cause to terminate an at-will employee.'" *King*, 418 Mass. at 582, quoting *Smith-Pfeffer*, 404 Mass. at 150.

Engaging in activity such as investigating fraud on an agency of the Commonwealth is the type of public activity that would seem to protect an at-will employee from retaliatory termination. *Cf. Korb v. Raytheon Corp.*, 410 Mass. 581, 584 n.3 (1991) (although plaintiff advocated publicly against war spending, his at-will termination by his defense contractor employer was not unlawful as defendant was not

"attempting to suppress [plaintiff's] speech in order to cover up its own wrongdoing."). Complaints about internal corporate matters, however, which are arguably at play here, do not implicate the public policy exception. *Dorman v. Norton Co.*, 64 Mass. App. Ct. 1, 10-11 (2005).

***Overtime Pay Violations***

Mass. Gen. Laws. ch. 151, § 1A, governs overtime pay and states, in relevant part, "[e]xcept as otherwise provided in this section, no employer in the commonwealth shall employ any of his employees in an occupation, as defined in section two, for a work week longer than forty hours, unless such employee receives compensation for his employment in excess of forty hours at a rate not less than one and one half times the regular rate at which he is employed." The statute, however, also lists a number of professions to which the section does not apply, including persons who are employed, "in a hospital, sanatorium, convalescent or nursing home, infirmary, rest home or charitable home for the aged." *Id*. § 1A(16). This classification of exempt employees would appear to apply to Glynn.

ORDER

For the foregoing reasons, defendants' motions to dismiss Glynn's federal claims (Counts I and II) are <u>ALLOWED</u> with prejudice. The court declines jurisdiction over Glynn's state-law claims (Counts III through VI), and dismisses them from further

hearing in this forum without prejudice.  The Clerk will now close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE